**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**KENNETH E. THOMPSON,**            )
                                    )
        **Plaintiff,**            )
                                    )
                                    )   **Civ. 08-181 Erie**
                                    )
**MICHAEL J. ASTRUE,**              )
**COMMISSIONER OF SOCIAL**          )
**SECURITY,**                       )
                                    )
        **Defendant.**            )

## OPINION

### I. Introduction

    This case is before us on appeal from a final decision by the defendant, Commissioner of

Social Security ("the Commissioner"), denying Kenneth E. Thompson's claim for disability

insurance benefits and supplemental security income  under Title II and Title XVI of the Social

Security Act , 42 U.S.C. §§ 401-433, 1381-1383(f).  The parties have submitted cross-motions

for summary judgment.  For the reasons stated below, we will grant Plaintiff's motion for

summary judgment to the extent that he seeks a remand for further proceedings; otherwise we

deny said motion and likewise deny the Defendant's motion for summary judgment.

### II. Procedural History

    Kenneth Thompson applied for Supplemental Security Income ("SSI") under Title XVI

of the Social Security Act ("SSA"), 42 U.S.C. § 1383(c) and Disability Insurance Benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. § 405(g) on December 21, 2006,

alleging a disability due to vertigo, blurred vision, sleep apnea, high blood pressure,

hypothyroidism, knee pain and obesity, with an alleged onset date of July 10, 2006.  (R. at 42,

53).  Plaintiff's claim was initially denied on March 21, 2007.  (R. at 42-52; 53-63).  A timely

request for a hearing was filed by Plaintiff.  (R. at 64.).  A hearing was held before an

Administrative Law Judge ("ALJ") on October 12, 2007, at which Plaintiff was represented by counsel and testified.  (R. at 21-32, 34).  Additionally, a vocational expert ("VE") testified regarding the availability of jobs in the national economy for an individual with Plaintiff's limitations and an ability to perform sedentary work.  (R. at 32-34).

By decision dated November 20, 2007, the ALJ determined that Plaintiff is not disabled under §§ 216(i) or 223(d) of the SSA.  (R. at 17).  The ALJ found that Plaintiff has the following severe impairments: obesity and hearing loss.  (R. at 13).  The ALJ also found that Plaintiff has the following non-severe impairments:  hypothyroidism, diabetes, hypertension, sleep apnea, and depression.  (R. at 13.)  The ALJ found that Plaintiff's non-severe impairments are controlled by medication and continued treatment and do not cause more than minimal limitations.  (R. at 13.)  Finally, the ALJ rejected Plaintiff's complaints of vertigo or dizziness as "not associated with a medically determinable impairment, and cannot be considered to cause any functional restrictions per SSR 96-4P."  (R. at 14.)  The ALJ determined that none of the impairments or combination of impairments meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appdx. 1.  (R. at 14).

The ALJ found that Plaintiff's allegations of significant fatigue with dizziness, blurred vision, nausea and episodes of syncope, joint pain, and swelling associated with obesity to be not entirely credible.  (R. at 15.)  The ALJ stated that Plaintiff's "medically determinable impairments could reasonably be expected to produce most of the alleged symptoms, but that claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."  (R. at 15.)  Specifically, the ALJ noted that the severity of Plaintiff's obesity "would likely cause fatigue, joint pain and swelling such that he would be limited to sedentary work with additional postural restrictions."  (R. at 16.)  The ALJ determined that Plaintiff has the residual functional capacity to perform sedentary work, except that he is prohibited from postural activities like stooping, climbing, kneeling, crawling, crouching and balancing.  (R. at 14.)  Additionally, the ALJ found that Plaintiff is unable to perform his past

2

relevant work, but that he does have the residual functional capacity to perform sedentary work, which exists in significant numbers in the national economy. (R. at 16-17).

Plaintiff filed a timely review of the ALJ's determination, (R. at 6-7), which was denied by the Appeals Council on May 30, 2008. (R. at 1-3). Having exhausted his administrative remedies, Plaintiff filed the instant action seeking judicial review of the final decision of the Commissioner of Social Security denying his DIB and SSI applications. Plaintiff was awarded disability benefits on a subsequent application on October 4, 2008, indicating that Plaintiff was found disabled as of May 1, 2008. (Ex. A, attached to Brief in Support of Plaintiff's Motion for Summary Judgment (Doc. 15)). Thus, the relevant time frame for our consideration is whether Plaintiff was disabled between July 10, 2006, and November 20, 2007, the date of the ALJ's decision.

### III. Standard of Review

When reviewing a decision denying DIB and SSI, the District Court's role is limited to determining whether substantial evidence exists in the record to support the ALJ's findings of fact. *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002). Substantial evidence is defined as "more than mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Pareles,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 205(g); *Richardson,* 402 U.S. at 390. A district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh evidence of record. *Palmer v. Apfel,* 995 F.Supp. 549, 552 (E.D.Pa. 1998). Rather, so long as the ALJ's decision is supported by substantial evidence and decided according to the correct legal standards, the decision will not be reversed. *Fargnoli v. Massanari,* 247 F.3d 34, 38 (3d Cir. 2001). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. § 706.

3

## IV. Discussion

Under the SSA, the term "disability" is defined as the:

> inability to engage in any substantial gainful activity by reason of
> any medically determinable physical or mental impairment which
> can be expected to result in death or has lasted or can be expected
> to last for a continuous period of not less than 12 months ...

42 U.S.C. §§ 416(i)(l)(A); 423(d)(1)(A); 20 C.F.R. 404.1505. A person is unable to engage in

substantial activity when he:

> is not only unable to do his previous work but cannot, considering
> his age, education, and work experience, engage in any other kind
> of substantial gainful work which exists in the national economy,
> regardless of whether such work exists in the immediate area in
> which he lives, or whether a specific job vacancy exists for him, or
> whether he would be hired if he applied for work....

42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled under the SSA, a five-step sequential

evaluation process must be applied. 20 C.F.R. § 404.1520. *See McCrea v. Commissioner of*

*Social Security,* 370 F.3d 357, 360 (3d Cir. 2004). The evaluation process proceeds as follows.

At step one, the Commissioner must determine whether the claimant is engaged in substantial

gainful activity for the relevant time periods; if not, the process proceeds to step two. 20 C.F.R. §

404.1520(a)4(i). At step two, the Commissioner must determine whether the claimant has a

severe impairment. § 404.1520(a)(4)(ii). If the Commissioner determines that the claimant has a

severe impairment, he must then determine whether that impairment meets or equals the criteria

of an impairment listed in 20 C.F.R., part 404, subpart p, Appx. 1. § 404.1520(a)(4)(iii). If the

claimant does not have an impairment which meets or equals the criteria, at step four the

Commissioner must determine whether the claimant's impairment or impairments prevent him

from performing his past relevant work. § 404.1520(a)(4)(iv). If so, the Commissioner must

determine, at step five, whether the claimant can perform other work which exists in the national

economy, considering his residual functional capacity and age, education and work experience. §

4

404.1520(a)(4)(v). *See also McCrea,* 370 F.3d at 360; *Sykes v. Apfel,* 228 F.3d 269, 262-63 (3d Cir. 2000).

Plaintiff makes several arguments in support of his motion for summary judgment. Plaintiff argues that the ALJ erred in determining that Plaintiff's vertigo or dizziness was not a medically determinable impairment, and thus erred in determining that it was not a severe impairment. Next, Plaintiff argues that the ALJ failed to properly evaluate the medical evidence. Plaintiff further argues that the ALJ erred in rejecting Plaintiff's subjective complaints as not entirely credible. Finally, Plaintiff argues that the ALJ erred in relying on the vocational expert's testimony because the answer was not in response to the actual limitations found by the ALJ. Thus, Plaintiff argues that substantial evidence does not support the ALJ's determination that Plaintiff has the residual functional capacity to perform modified sedentary work.

In response to Plaintiff's arguments, Defendant argues that substantial evidence supports the ALJ's determination that Plaintiff's vertigo or dizziness was not a medically determinable impairment, and thus not a severe impairment. Defendant also argues that the ALJ complied with the regulations in evaluating the medical evidence and medical source opinions. Next, Defendant argues that substantial evidence supports the ALJ's determination that Plaintiff's subjective complaints are not entirely credible. Finally, Defendant argues that substantial evidence supports the ALJ's determination that Plaintiff could perform a modified range of sedentary work notwithstanding the difference between the ALJ's determination of Plaintiff's limitations in his decision and the limitations presented in the ALJ's hypothetical question to the vocational expert.

### A. Whether Substantial Evidence Supports the ALJ's Finding that Plaintiff's Vertigo/Dizziness was Not a Medically Determinable Impairment

Plaintiff argues that the ALJ erred in determining that Plaintiff's dizziness is not associated with a medically determinable impairment and therefore is not entitled to any consideration in determining whether Plaintiff is disabled. Specifically, Plaintiff argues that the

ALJ erred in concluding that the medical evidence shows that testing and examination of

Plaintiff were normal. To the contrary, Plaintiff argues that the record evidence contains an

adequate clinical basis for the existence of Plaintiff's impairment and thus the ALJ erred in

relying on SSR 96-4p in concluding that Plaintiff's dizziness cannot be considered to cause any

functional restrictions.

Three treating physicians evaluated Plaintiff regarding his complaints of dizziness:

Plaintiff's primary care doctor, Dr. Frank Reusche,; an Ear Nose and Throat specialist from Erie,

Pennsylvania, Dr. Sidney Lipman,; and an Ear Nose and Throat specialist in balance disorders

located in Pittsburgh, Pennsylvania, Dr. Joseph Furman. In addition, a non-examining state

agency physician, Dr. Abu Ali, issued an opinion.

Vertigo is defined as "an illusory sense that either the environment or one's own body is

revolving; it may result from diseases of the inner ear or may be due to disturbances of the

vestibular centers or pathways in the central nervous system. The term is sometimes erroneously

used to mean any form of dizziness." Dorland's Illustrated Medical Dictionary, 2080 (31st ed.

2007). "Paroxysmal Vertigo" is 'vertigo occurring in a sudden brief attack." *Id.* Benign

Paroxysmal Positional Vertigo" is characterized by "recurrent brief periods of positional vertigo

and nystagmus [an involuntary, rapid, rhythmic movement of the eyeball[1]] occurring when the

head is placed in certain positions such as with one ear down. It is due to otolithiasis

[inflammation of the inner ear, often with pain, fever, hearing loss, tinnitus, and vertigo[2]] that

causes exaggerated movement of the endolymph [the fluid contained in the labyrinth of the

ear[3]]." *Id.*

---

[1] Dorland's Illustrated Medical Dictionary, 1327 (31st ed. 2007).
[2] Dorland's Illustrated Medical Dictionary, 1371, 1372.
[3] Dorland's Illustrated Medical Dictionary, 626.

6

1.

At step two of the Sequential Process, the ALJ addressed Plaintiff's complaints of

dizziness as follows:

> [T]he claimant has long-standing complaints of dizziness (see, e.g.,
> Exhibit 1F, 7) for which he underwent extensive diagnostic testing.
> Read together, MRI and CT of the brain show no abnormality
> (Exhibit 1F, 28). Vestibular laboratory testing, brain stem
> auditory-evoked response, and EEG were likewise normal (Exhibit
> 1F, 28). There was no clinical evidence of nystagmus or vertigo
> (Exhibit 1F, 29). Physical examination was entirely within normal
> limits and the ultimate diagnosis was dizziness of uncertain
> etiology (Exhibits 1F, 29; 2F, 13). More recent repeat CT scan of
> the brain was unremarkable (Exhibit 18F, 2). The claimant's
> symptoms of dizziness are not associated with a medically
> determinable impairment, and cannot be considered to cause any
> functional restrictions per SSR 96-4P.

(R. at 14). When evaluating the medical evidence the ALJ rejected the opinions of Plaintiff's

treating physicians explaining that the treating physician's opinions are "not clinically supported

in spite of ongoing complaints." (R. at 16.)   In contrast, the ALJ found the non-examining state

agency medical opinion to be "essentially consistent" with the ALJ's assessment "and with the

medical evidence as a whole," and was therefore given "great weight and adopted" by the ALJ.

(R. at 16.)

"The step-two inquiry is a *de minimis* screening device to dispose of groundless claims."

*Newell v. Commissioner*, 347 F.3d 541, 546 (3d Cir. 2003)(citing *Smolen v. Chater,* 80 F.3d

1273, 1290 (9th Cir. 1996); *McDonald v. Secretary of Health & Human Servs.,* 795 F.2d 1118,

1124 (1st Cir.1986)).  "Although the regulatory language speaks in terms of 'severity,' the

Commissioner has clarified that an applicant need only demonstrate something beyond 'a slight

abnormality or a combination of slight abnormalities which would have no more than a minimal

effect on an individual's ability to work.'" *McCrea v. Commissioner,* 370 F.3d 357, 360 (3d cir.
2004)(quoting SSR 85-28). *"Newell* and *McCrea* instruct that the determination of whether an
applicant has met her burden at step two in the sequential analysis should focus upon the
evidence adduced by the applicant. If such evidence demonstrates that the applicant has "more
than a 'slight abnormality,' the step-two requirement of 'severe' is met, and the sequential
evaluation process should continue."" *Magwood v. Commissioner,* 2008 WL 4145443, *2 (3d
Cir. Sept. 9, 2008)(quoting *Newell,* 347 F.3d at 546; *McCrea,* 370 F.3d at 362; 20 C.F.R. §
404.920(d)-(f).)

   A review of the evidence adduced by Plaintiff demonstrates that he has met the *de
minimis* requirements of step two.

## 2.

   Plaintiff has been treated by Dr. Reusche since October 2005. Plaintiff has worked as a
bricklayer/mason for thirty years, until he reached age 48. Dr. Reusche's medical notes indicate
that Plaintiff had passed out while at work in June 2006 due to dizziness and heat exhaustion.
(R. at 194.) Dr. Reusche evaluated Plaintiff on July 10, 2006, at which time Plaintiff stated that
in the past week he had a "gray out" where his vision went gray (but he did not pass out), that he
almost passed out in the shower, and that he felt weak and dizzy. (R. at 194.) On July 13, 2006,
Plaintiff stated to Dr. Reusche that he continued to have "episodes of lightheadedness as well as
vertigo 3 to 4 times a day." (R. at 195.) Dr. Reusche diagnosed Plaintiff with vertigo and
prescribed Antivert. (R. at 195.)

   Plaintiff was seen by Dr. Reusche again on July 18, 2006, at which time he stated that the
Antivert did not seem to be effective, explaining that he had the sensation at work that he was

8

going to pass out and fall. (R. at 196.) Plaintiff further reported that he continued to have vertigo especially when lying down and that his symptoms were worse when his eyes are closed. (R. at 196.) Dr. Reusche diagnosed a possible middle ear infection ("right otitis media") and "Vertigo/labyrinthitis." (R. at 196.) Dr. Reusche instructed Plaintiff to use the Antivert as needed, and to not work "for now due to the increase[d]risk for injury and fall." (R. at 196.)

Plaintiff returned to Dr. Reusche on July 24, 2006, and stated that he had no significant change in his otitis and that he "continues to have persistent vertigo, especially as position changes." (R. at 196.) Because neither condition had improved, Dr. Reusche referred Plaintiff to Dr. Sidney Lipman, a local Ear, Nose, and Throat specialist. (R. at 197.)

At Plaintiff's two-week follow-up appointment on August 7, 2006, Dr. Reusche indicated that Dr. Lipman felt that Plaintiff's vertigo was a vestibular problem. (R. at 197.) Dr. Reusche further indicated that Dr. Lipman had prescribed a ten-day treatment of Prednisone, but Plaintiff noticed no significant improvement. (R. at 197.) In addition, Plaintiff attempted to return to work twice, but both times he had "marked vertigo," and that his boss felt it was unsafe for Plaintiff to be at work. (R. at 197.) Dr. Reusche noted that Dr. Lipman had arranged for an MRI scan, as well as ENG, ABR, and ECOG testing. (R. at 197.) A November 30, 2006 Progress Note indicates that Plaintiff continued to have vertigo. (R. at 199.)

In Dr. Reusche's October 2007 Opinion he diagnosed Plaintiff with "vertigo with syncopal episodes of uncertain etiology[,] super-morbid obesity with sleep apnea, diet-controlled diabetes mellitus, hypertension, hypothyroidism, mild coronary artery disease with homocysteinemia and hyperlipidemia, complicated by new depression and possibly delayed post-traumatic stress disorder . . . ." (R. at 326, 328.) Dr. Reusche further stated: "Mr.

9

Thompson continues to have vertigo, near-syncopal episodes, shortness of breath upon exertion, sleep disturbance with daytime somnolence and depression. As a result he is unsafe to work at a construction site at heights climbing stairs, ladders or scaffolding, operating dangerous machinery or equipment, bending or stooping, lifting or carrying loads." (R. at 326-327.) Additionally, Dr. Reusche stated: "As his primary symptoms of vertigo remain essentially unchanged for over one year, his prognosis is guarded at best." (R. at 327.) Dr. Reusche's opinion was that Plaintiff has "not been able to perform full-time work in a competitive fashion since July 2006, due to his constellation of symptoms and his progressive deterioration of condition." (R. at 327.)

### 3.

Plaintiff was referred to Dr. Sidney Lipman, of Ear Nose and Throat Specialists of Northwestern Pennsylvania on July 24, 2006, and was able to see him that same day. (R. at 144.) Dr. Lipman noted that an audiogram showed moderate sensorineural hearing loss bilaterally, and gave his impression as "Sensorineural hearing loss" and "Dizziness. Sounds like a vestibular problem." (R. at 143.) Dr. Lipman prescribed a ten-day treatment of Prednisone, inner ear blood tests, an MRI scan, and ENG, ABR, and ECOG testing. (R. at 143.)

Plaintiff underwent the prescribed treatment, but with no relief of his symptoms. Plaintiff returned to Dr. Lipman on August 15, 2006, at which time Dr. Lipman prescribed Klonipin for Plaintiff's dizziness. (R. at 145.) One week later Dr Lipman increased the dosages Plaintiff had reported that he had not noticed any difference with the medication. (R. at 140.) On August 23, 2006, Plaintiff reported to Dr. Lipman that he had started to notice bad dizzy spells with activity, some blurred vision, and nausea. (R. at 140.) Dr. Lipman instructed Plaintiff to wean off the

Klonipin. (R. at 140.) Dr. Lipman also referred Plaintiff to Dr. Joseph Furman, an Ear, Nose

and Throat specialist in Pittsburgh, Pennsylvania, for "thorough evaluation and treatment" of

Plaintiff's "vestibular problem." (R. at 139.) On September 20, 2006, Dr. Lipman stated on a

Public Welfare form that Plaintiff's diagnosis was "vestibulopathy," and indicated that he was

disabled and unable to work. (R. at 140.)

**4.**

Plaintiff was seen by Dr. Joseph Furman of the Eye and Ear Institute/University Ear,

Nose & Throat Specialists of Pittsburgh, Pennsylvania on September 11, 2006. (R. at 164.) Dr.

Furman indicated that Plaintiff reported his symptoms as follows:

> The patient states that when he was working with cement block at
> work on a hot day, he noticed that everything started to "go black"
> and then he experienced vertigo, disorientation, nausea, vomiting,
> and fatigue. Symptoms subsided over several hours and the patient
> was able to drive himself home. The patient indicates that he has
> not worked since that time. Episodes of dizziness are worse with
> eye closure and exertion. The patient has noticed imbalance in
> darkness. He has noticed dizziness with the position change,
> including getting out of bed, laying down, tipping his head forward
> or backward, rolling over in bed, making quick head movement,
> tipping his head backward in the shower. The patient notes that he
> has had approximately 3 panic attacks, some associated with
> dizziness. He also complains of occasional blurred and double
> vision, being bothered by certain visual patterns, and looking at
> moving visual objects. The patient notes some difficulty
> concentrating, difficulty finding words. He also states that he has
> visual hallucinations prior to "blacking out." He notes some
> photophobia. The Patient clearly describes the dizziness that can
> occur in association with visual changes like spots in front of eyes.

(R. at 164.) Dr. Furman noted Dr. Lipman's diagnosis of sensorineural hearing loss based on

audiometric testing of July 24, 2006. (R. at 164.) Dr. Furman stated that based on abnormal

11

Static Positional Testing his impression was that the results are "supportive of vestibulo-ocular

dysfunction but are non-specific and non-localizing." (R. at 219.)

Plaintiff also underwent Vestibular-Evoked Myogenic Potential Testing, which was

mildly abnormal "suggesting a slight diminishing of otolith-spinal responses bilaterally." (R. at

215-216.) Dr. Furman further notes that these abnormal results "suggest a mild central

suppression of vestibular responses." (R. at 215.) Dr. Furman further stated

> My impression is that Mr. Kenneth Thompson is suffering from
> dizziness of uncertain etiology. The patient's history is suggestive
> of benign paroxysmal positional vertigo but I was unable to
> confirm that diagnosis today.

(R. at 165.) Dr. Furman also recommended that Plaintiff "be enrolled in a course of balance

rehabilitation therapy at a facility convenient to him" and he prescribed the medication

Sertraline. (R. at 166.)

**5.**

The non-examining state agency physician, Dr. Abu Ali, completed a physical Residual

Functional Capacity Assessment of Plaintiff. (R. at 230-236.) Dr. Ali stated that "the medical

evidence establishes a medically determinable impairment of exogenous obesity, B[enign]

P[aroxysmal] P[ositional] V[ertigo], Chest pain. (R. at 235.) On the first page of the

Assessment Form, Dr. Ali listed as Plaintiff's secondary diagnosis, "Dizziness of uncertain

etiology." (R. at 230.) Thus, just like Dr. Reusche, Dr. Lipman, and Dr. Furman, Dr. Ali's

diagnosis supported a finding of dizziness or vertigo.

**6.**

Social Security Ruling 96-4p instructs that "[i]n claims in which there are no medical

signs or laboratory findings to substantiate the existence of a medically determinable physical or

12

mental impairment, the individual must be found not disabled at step 2 of the sequential evaluation process set out in 20 CFR 404.1520 and 416.920." SSR 96-4p. That is what the ALJ here did. The ALJ determined that the relevant medical evidence was normal with regard to Plaintiff's complaints of dizziness. The ALJ thus found no medical evidence, that is, no signs, symptoms, or laboratory findings, to establish an impairment associated with dizziness of uncertain etiology or Benign Paroxysmal Positional Vertigo. Since the ALJ found that Plaintiff had no "medically determinable impairment" he was required, pursuant to SSR 96-4p, to find that Plaintiff was not disabled with regard to his allegation of dizziness or vertigo.

The ALJ's determination that Plaintiff's dizziness was not associated with a medically determinable impairment is not supported by substantial evidence because the ALJ failed to focus on all the evidence adduced by Plaintiff as required by *Newell* and *McCrea. Newell,* 347 F.3d at 546; *McCrea,* 370 F.3d at 362.

Social Security Ruling 96-4p states that "the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; *i.e.,* medical signs and laboratory findings." SSR 96-4p. Here, abnormal medical signs and laboratory findings support the existence of a medically determinable impairment. An audiogram showed moderate sensorineural hearing loss bilaterally. (R. at 143.) Static Positional Testing was abnormal and "supportive of vestibulo-ocular dysfunction." (R. at 219.) Vestibular-Evoked Myogenic Potential Testing was also abnormal "suggesting a slight diminishing of otolith-spinal responses bilaterally" and "a mild central suppression of vestibular responses." (R. at 215-216.) "This testing clearly substantiated [Plaintiff's] complaints" of

13

dizziness and associated symptoms.  *McCrea*, 370 F.3d at 361.  The ALJ did not acknowledge these abnormal tests.

Plaintiff's three treating physicians all agreed that Plaintiff was experiencing dizziness and associated symptoms and diagnosed him with a vestibular problem, dizziness, or vertigo.  In addition, Dr. Ali's review of the medical evidence also convinced him that Plaintiff had a medically determinable impairment of vertigo/dizziness with uncertain etiology.  The ALJ adopted Dr. Ali's opinion but failed to explain, or even acknowledge, that his step two determination regarding Plaintiff's dizziness is contradicted by Dr. Ali's diagnosis.

Because he did not acknowledge the abnormal medical tests or Dr. Ali's diagnosis, the ALJ essentially determined that Plaintiff had no medically determinable impairment at step two solely based on Plaintiff's symptoms.  However, Plaintiff's symptoms are symptoms that are expected to result from, and supported by, all four physicians' diagnoses.  Moreover, Plaintiff's statements regarding the nature and extent of his dizziness and associated symptoms are supported by "medically acceptable clinical diagnostic techniques" showing an abnormality, and thus "represent[] a medical 'sign' rather than a 'symptom.'"  SSR 96-4p n2.  Accordingly, we conclude that the ALJ's determination that Plaintiff did not have a severe impairment at step two in the sequential analysis is not supported substantial evidence.

We note that because the ALJ determined that Plaintiff's dizziness was not associated with a medically determinable impairment, the ALJ never considered at step two how Plaintiff's symptoms might limit his ability to engage in certain activities.  On remand, the ALJ must consider the Plaintiff's reported symptoms along with the opinions of his treating physicians.  *See Magwood*, 2008 WL 4145443, *2 (ALJ erred at step two by *weighing* the evidence adduced

14

by applicant against the evidence of consultative physicians contrary to the *McCrea* Court's instruction to focus upon the evidence adduced by the applicant.)

## B. Whether the ALJ Properly Evaluated the Medical Evidence

Plaintiff argues that the ALJ failed to properly evaluate the medical evidence. Plaintiff argues that the ALJ erred by failing to address Dr. Ali's opinion that Plaintiff had a medically determinable impairment of vertigo. Additionally, Plaintiff argues that the ALJ erred by rejecting Dr. Reusche's opinion that Plaintiff could not work by considering Dr. Reusche's opinion to be solely based on Plaintiff's vestibular problem and ignoring the other medical reasons given by Dr. Reusche to support his opinion. Plaintiff also argues that the ALJ erred in his evaluation of the medical evidence as it relates to Plaintiff's sleep apnea.

As the finder of fact, the ALJ is required to review, properly consider and weigh all of the medical records provided concerning the claimant's claims of disability. *Fargnoli,* 247 F.3d at 42 (citing *Dobrowolsky v. Califano,* 606 F.2d 403, 406-07 (3d Cir.1979)). "In doing so, an ALJ may not make speculative inferences from medical reports." *Plummer v. Apfel,* 186 F.3d 422, 429 (3d Cir. 1999) (citing *Smith v. Califano,* 637 F.2d 968, 972 (3d Cir.1981)). "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Morales v. Apfel,* 225 F.3d 310, 317 (3d Cir.2000) (quoting *Plummer,* 186 F.3d at 429) (citations omitted). While an ALJ may reject a treating physician's assessment, he may do so " 'outright only on the basis of contradictory medical evidence' and not due to his or her own credibility judgments, speculation or lay opinion." *Id.* (quoting *Plummer,* 186 F.3d at 429) (citations omitted); 42 U.S.C.A. § 423(d)(1)(A). Indeed, the ALJ may not substitute his own opinions for the opinions of an examining physician. *Plummer,* 186 F.3d at 422 (citing *Ferguson v. Schweiker,* 765 F.2d 31, 37 (3d Cir.1985)). When the medical evidence provided by a treating physician or physician conflicts with other medical evidence of record, "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" *Id.* (citing *Mason v. Shalala,* 994 F.2d

15

1058, 1066 (3d Cir.1993)).  Moreover, the ALJ must consider all the evidence and give some reason for dismissing the evidence he chooses to reject.  *Id.* (citing *Stewart v. Secretary of H.E.W.,* 714 F.2d 287, 290 (3d Cir.1983)).  42 U.S.C.A. § 423(d)(1)(A).  Finally, "[i]f a treating physician's opinion is rejected, the ALJ must consider such factors as the length of the treatment relationship, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record evidence, any specialization of the opining physician and other factors the plaintiff raises, in determining how to weigh the physician's opinion." *Sanchez v. Barnhart,* 388 F.Supp. 405, 412 (D.Del.2005) (citing 20 C.F.R. § 404.1527(d)(2)-(6)).

The reasons discussed above addressing the ALJ's error at step two support a finding that the ALJ failed to properly weigh the medical evidence.  The ALJ failed to properly consider the medical evidence relating to Plaintiff's dizziness and therefore the ALJ did not weigh this evidence at step four nor did he consider this evidence when determining Plaintiff's residual functional capacity.  Thus, substantial evidence does not support the ALJ's evaluation of the medical evidence.

In addition, the ALJ erred in failing to account for Dr. Ali's opinion that Plaintiff had a medically determinable impairment of vertigo.  The ALJ first determined that the medical evidence did not support Plaintiff's symptoms of dizziness.  (R. at 14.)  Next, the ALJ rejected the opinions of Dr. Lipman and Dr. Reusche because these physicians' based their opinion on Plaintiff's "vestibular problem", which the ALJ found to be "not clinically supported."  (R. at 16.)  Finally, the ALJ stated: "The state agency medical opinion is essentially consistent with this assessment and with the medical evidence as a whole.  It is therefore given great weight and adopted."  (R. at 16.)

Although Dr. Ali found Plaintiff to be more functional than Plaintiff claimed, Dr. Ali explicitly accepted the medical evidence of record that showed that Plaintiff had a medically determinable impairment of vertigo.  In contrast, the ALJ found that the same medical evidence did not "clinically support" Plaintiff's complaints and that Plaintiff's symptoms of dizziness are

16

"not associated with a medically determinable impairment." (R. at 14, 16.) Additionally, Dr. Ali took into account Plaintiff's dizziness and associated symptoms when considering Plaintiff's functional restrictions while the ALJ did not. (R. at 14.) (Under the ALJ's step two ruling, Plaintiff's symptoms of dizziness "cannot be considered to cause any functional restrictions per SSR 96-4P.") The ALJ erred by failing to address these serious conflicts between his own findings and Dr. Ali's opinion.

We also find error with the ALJ's overall assessment of Dr. Reusche's opinion. The ALJ stated that "the claimant's treating physicians, Dr. Lipman and Dr. Reusche, have stated that it would be inappropriate for the claimant to work because of his vestibular problem." (R. at 16.) In Dr. Reusche's October 1, 2007 opinion he stated: "In my opinion, Mr. Ken Thompson has not been able to perform full-time work in a competitive fashion since July 2006, due to his constellation of symptoms and his progressive deterioration of condition." (R. at 327.) In addition to Plaintiff's symptoms related to vertigo, Dr. Reusche describes Plaintiff as also exhibiting symptoms of shortness of breath, sleep disturbance with daytime somnolence, and depression. (R. at 326, 329.) Moreover, Dr. Reusche also opined that Plaintiff's weight continues to climb, "worsening his sleep apnea, straining his control of blood pressure and blood sugar, and worsening his overall prognosis." (R. at 327.) The ALJ focused solely on Dr. Reusche's opinion as it related to vertigo and failed to address the other symptoms noted by Dr. Reusche, in particular Plaintiff's fatigue and sleep disturbance. This was error.

Finally, we cannot say that substantial evidence supports the ALJ's evaluation of Plaintiff's sleep apnea as being controlled with treatment. (R. at 13, 15.) "Sleep Apnea," like Plaintiff's, is characterized by recurrent interruptions of breathing during sleep due to temporary obstruction of the airway." Stedman's Medical Dictionary, 119 (28th ed. 2006). It often results in chronic fatigue. Id. One treatment for sleep apnea involves the use of a Continuous Positive Airway Pressure machine, or "CPAP" machine. A CPAP machine consists of a mask worn over the patient's face, which allows for air pressure in the patient's throat to prevent the airway from collapsing when the patient breathes in.

17

Plaintiff was fitted with a CPAP machine to control his sleep apnea sometime in November 2006. (R. at 311.) On November 30, 2006, Dr. Reusche indicated that Plaintiff was "tolerating the CPAP machine well," he reported that he was "sleeping better" but that he also "identified some difficulty sleeping on his side due the mask but overall he is feeling better." (R. at 199.) The November 30, 2006 treatment note is the only medical evidence indicating that Plaintiff's sleep apnea was controlled.

On June 8, 2007, Plaintiff called to cancel an appointment due to his vertigo, and also stated that "his sleep apnea is worsening" and he reported that "he is unable to lie down and he is unable to get more than two hours of sleep at a time." (R. at 303.) A few days later, Plaintiff's treatment notes indicate: "Sleep apnea – feeling that his CPAP machine is not helping him. He is waking up in a panic type sensation." (R. at 302.) Dr. Reusche recommended that Plaintiff contact his CPAP provider for "possible changes in the settings or need for readjustments." (R. at 302.) The July 30, 2007 Treatment notes indicate as follows:

> [Plaintiff] feels he has not been sleeping. He had though[t] it might be related to his CPAP and his sleep apnea which he feels is worse. The CPAP was refitted and he has noted no significant improvement. Complaining of extreme lethargy and poor exercise tolerance as well.

(R. at 298.) Dr. Reusche noted that Plaintiff "continued to experience difficulty sleeping," not falling asleep, and daytime fatigue. (R. at 298.) Dr. Reusche further noted that although the CPAP machine was refit, Plaintiff did not feel it was much of an improvement. (R. at 298.) As already noted, Dr. Reusche indicated in his opinion that Plaintff experienced "sleep disturbance with daytime somnolence" and that his continual weight gain was "worsening his sleep apnea." (R. at 327, 327.)

In addition, Plaintiff's testimony is consistent with the medical evidence. He testified at the hearing that he gets up early in the morning because he "can't sleep." (R. at 25). He further testified as follows:

18

> I choose not to drive because I don't feel as safe because I'm
> constantly falling asleep. I have trouble staying awake. I don't get
> a good night's rest, and I find myself nodding off.

(R. at 26.) The ALJ did not ask Plaintiff about his sleep apnea, however, in response to his

attorney's question about his sleep apnea, Plaintiff testified as follows:

> Well, I have a C-Pap machine that I use. It – when I first start out
> sleeping, I fall asleep. It seems to help, but within an hour's time,
> I'm waking up and panicking and cannot get air. It's like I'm not
> breathing well. I have to sit up because I breathe much better
> sitting up, and I have to just sit at the edge of the bed and sit there
> like that for a good half hour and get a good breathing pattern
> back. And then I lay down again, and I try to go back to sleep, but
> I'm up and down all night long like that. I mean it's off and on.
> I'm lucky to get two, three hours sleep at night.

(R. at 30.)

The ALJ failed to address the medical evidence supporting Plaintiff's fatigue and sleep

disturbance, and failed to explain his conclusion that Plaintiff's sleep apnea was controlled with

treatment in light of the medical evidence indicating that it was not controlled.

For all of the above reasons we find that substantial evidence does not support the ALJ's

evaluation of the medical evidence.

## C. Whether the ALJ Erred in Determining that Plaintiff's Subjective Complaints Are Not Entirely Credible

Plaintiff argues that the ALJ erred in rejecting Plaintiff's subjective complaints as not

entirely credible.

An ALJ must consider subjective complaints by the claimant and evaluate the extent to

which those complaints are supported or contradicted by the objective medical evidence and

other evidence in the record. 20 C.F.R. § 404.1529(a). Social Security regulations specifically

incorporate a two-part evaluation of subjective symptoms. *See* 20 C.F.R. § 404.1529 (setting

forth factors describing how allegations of subjective symptoms are to be evaluated). First, the

19

ALJ must determine whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms. 404.1529(b); SSR 96-7p. If such impairment exists, then the ALJ must determine the extent to which the claimant's allegations are credible by evaluating "the intensity and persistence of the pain or symptom, and the extent to which it affects the [claimant's] ability to work." *Hartranft v. Apfel*, 181 F. 3d 358, 362 (3d Cir. 1999); 404.1529(b); SSR 96-7p. In making this determination, the ALJ should consider the objective medical evidence as well as other factors such as the claimant's own statements, the claimant's daily activities, the treatment and medication the claimant has received, any statements by treating and examining physicians or psychologists, and any other relevant evidence in the case record. 20 C.F.R. § 416.929(c); SSR 96-7p.

"The authority to evaluate the credibility of [the claimant] concerning pain and other subjective complaints is reserved for the ALJ." *Gilmore v. Barnhart,* 356 F.Supp.2d 509, 513 (3d Cir.2005) (citations omitted). While the ALJ must give a claimant's subjective complaints "serious consideration," *Powell v. Barnhart,* 437 F.Supp.2d 340, 342 (E.D.Pa.2006) (citing *Burns,* 312 F.3d at 129), "the ALJ may reject a claimant's complaints if he does not find them credible." *Id.* (citing *Schaudeck v. Commissioner of Social Security,* 181 F.3d 429, 433 (3d Cir.1999)); *Hirschfield v. Apfel,* 159 F.Supp.2d 802, 811 (E.D.Pa.2001) (citing *Capoferri v. Harris,* 501 F.Supp. 32, 37 (E.D.Pa.1980), *aff'd* 649 F.2d 858 (3d Cir.1981); *Baerga v. Richardson,* 500 F.2d 309, 312 (3d Cir.1974), *cert. denied,* 420 U.S. 931, 95 S.Ct. 1133, 43 L.Ed.2d 403 (1975)) (holding that the ALJ may reject a claimant's subjective complaints of "disabling pain if he affirmatively addresses the claim in his decision, specifies the reason for

20

rejecting it, and has support for his conclusion in the record"). Moreover, "if supported by substantial evidence, the AL J's credibility findings may not be disturbed upon appeal." *Hirschfield,* 159 F.Supp.2d at 811 (citing *Van Horn v. Schweiker,* 717 F.2d 871, 871 (3d Cir.1983); *Smith,* 637 F.2d at 972; *Baerga,* 500 F.2d at 312).

"If the ALJ determines that the claimant's subjective testimony is not fully credible, the ALJ is obligated to explain why." *Burns*, 312 F.3d at 129. The ALJ may reject subjective complaints "if he affirmatively addresses the claim in his decision, specifies the reasons for rejecting it, and has support for his conclusions in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990). When the ALJ is faced with conflicting evidence, "he must adequately explain in the record his reasons for rejecting or discrediting competent evidence." *Sykes*, 228 F.3d at 266 n.9 (quotations and citations omitted). A district court need not defer to the ALJ's credibility determinations that are not supported by substantial evidence. *Smith*, 637 F.2d at 972; *Baerga*, 500 F.2d at 312.

Based on our discussion of the medical evidence and the ALJ's error at step two regarding the evaluation of Plaintiff's vertigo, we find that substantial evidence does not support the ALJ's credibility finding. Because of the initial errors, the ALJ did not consider record evidence supporting Plaintiff's vertigo and his alleged symptoms when making his partial credibility finding. *Sykes*, 228 F.3d at 266 n.9. The ALJ was required to consider such evidence when making his credibility finding.

Even without this general error, we would be unable to determine if substantial evidence supports the ALJ's partial credibility finding. In his opinion, the ALJ recited the applicable law and noted that Plaintiff alleges significant fatigue with dizziness, blurred vision, nausea, episodes

of syncope, and joint pain and swelling associated with obesity. (R. at 15.) The ALJ the made his credibility determination as follows:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce most of the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

(R. at 15.) He then concluded that "[o]verall, the severity of the claimant's obesity would likely cause fatigue, joint pain and swelling such that he would be limited to sedentary work with additional postural restrictions." (R. at 16.)

The ALJ did not discuss his reasons for his credibility finding. While he admits that Plaintiff's impairments could reasonably be expected to produce Plaintiff's symptoms, he only generally refers to "most of the alleged symptoms" without specifying which symptoms he is acknowledging. It is possible that the ALJ found Plaintiff credible only with regard to his symptoms of fatigue, joint pain, and swelling. However, the ALJ's partial credibility finding lacks a discussion of why he rejected Plaintiff's other unnamed symptoms and thus lacks any reference to record evidence to permit a reviewing court to determine what weight the ALJ gave to Plaintiff's symptoms.

We also note that the ALJ failed to acknowledge the fact that Plaintiff had a thirty-year history of consistently working as a mason and attempted to return to work several times before he applied for benefits. *Dobrowolsky,* 606 F.2d at 409 (Claimant's testimony as to his capabilities is entitled to substantial credibility where he had a twenty-nine year continuous work history); *Lang v. Barnhart,* 2006 WL 3858579, at *11 (W.D. Pa. Dec. 6, 2006)(citing cases). Finally, the medical evidence submitted by Plaintiff's treating physicians, two of whom are

specialists, indicates that all three doctors believed that Plaintiff actually experienced the dizziness and associated symptoms he alleged. Moreover, none of these doctors indicated that they thought that Plaintiff was imagining his symptoms or was otherwise being untruthful. The ALJ should have taken this evidence into consideration when making his credibility determination as relevant record evidence. 20 C.F.R. § 404.1529(a); 416.929(c); *Sykes*, 228 F.3d at 266 n.9.

## D. Whether Substantial Evidence Supports the ALJ's Finding at Step Five of the Sequential Evaluation by Relying on the Vocational Expert's Testimony

At step five of the sequential evaluation process, the Commissioner must determine whether Plaintiff can perform work that exists in the national economy based on his residual functional capacity. Here, the ALJ determined that Plaintiff has the residual functional capacity to perform modified sedentary work. The ALJ determined that Plaintiff has the residual functional capacity to perform sedentary work, except that Plaintiff is prohibited from postural activities like stooping, climbing, kneeling, crawling, crouching and balancing. (R. at 14.) The ALJ further noted that to "determine the extent to which [Plaintiff's] limitations erode the unskilled sedentary occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity." (R. at 17.) The vocational expert testified that "given all of these factors" an individual would be able to perform jobs such as surveillance systems monitor, telephone solicitor, and ticket taker." (R. at 17.)

Plaintiff argues that even assuming that the ALJ's opinion is otherwise supported; the ALJ erred because the ALJ's actual hypothetical question to the vocation expert did not include

23

the residual functional capacity as determined by the ALJ in his opinion. At the hearing the ALJ asked the vocational expert the following hypothetical question:

> [A]ssume an individual of the Claimant's age, education level, and past work experience with the following limitations. The maximum lifting is 10 pounds. The repeated maximum lifting is five pounds. Stand two hours out of an eight-hour day, sit six hours out of an eight hour day, walk two hours out of an eight-hour day. However, this individual could only occasionally stoop, kneel, crawl, crouch, balance, or climb.

(R. at 32-33.) In contrast, in his opinion that ALJ found that Plaintiff is "*prohibited* from postural activities like stooping, climbing, kneeling, crawling, crouching and balancing. (R. at 14 (emphasis added).)

The United States Court of Appeals for the Third Circuit instructs that a "vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments." *Burns*, 312 F.3d at 123 (citations omitted); *see also Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987); *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984). "A hypothetical question posed to a vocational expert must reflect all of a claimant's impairments." *Id.*

Here, either the ALJ's finding in his opinion is in error, or his hypothetical question to the vocational expert was in error. We are without sufficient information to determine where the error lies. If the ALJ's written finding is his correct finding, then the question to the vocational expert was not accurate. Social Security ruling 96-9p indicates that an individual who is unable to stoop would "usually" be found disabled. On the basis of this record we cannot say that substantial evidence supports the ALJ's residual functional capacity determination as we cannot

24

determine if the vocational expert's response was based on an accurate portrayal of Plaintiff's limitations.

## V. **Conclusion**

For the foregoing reasons, we conclude that there is not substantial evidence existing in the record to support the Commissioner's decision that Plaintiff is not disabled, and therefore, the Defendant's motion for summary judgment is denied. The Plaintiff's Motion for Summary Judgment is granted to the extent that it seeks a remand to the Commissioner for further proceedings consistent with this opinion, and otherwise is denied. This matter is remanded to the Commissioner for a decision not inconsistent with this opinion.

An appropriate order will be entered.

Sept. 14, 2009
Date

Maurice B. Cohill, Jr.
Maurice B. Cohill, Jr.
Senior United States District Court Judge

cc:    counsel of record

25